## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : |
| | : |
| **Plaintiff,** | : **Civil Action No.** |
| **v.** | : |
| | : |
| | : |
| **HARSH NAHATA and AJAY S. BHANDARI,** | : |
| | : |
| | : |
| **Defendants.** | : |
| | : |
| | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") files this Complaint against defendants Harsh Nahata ("Nahata") and Ajay S. Bhandari ("Bhandari") (collectively "Defendants") and alleges as follows:

## SUMMARY

1.     From about October 2017 to January 2018, Defendants unlawfully traded on the basis of material nonpublic information in the securities of KapStone Paper and Packaging Corporation ("KapStone") in advance of the January 29,

2018 public announcement that KapStone would be acquired by WestRock Company ("WestRock").

2.     During the relevant time period, Nahata was a manager in WestRock's corporate development group and had access to—and a duty to keep confidential—material nonpublic information concerning his employer WestRock's acquisition of KapStone.  In breach of his duty, Nahata both traded on this confidential information and tipped the information to his friend, Bhandari, who also traded.

3.     To assure that his trading would be difficult to trace back to him, Nahata confirmed with his broker ("Broker 1") that he would not be individually identified as holding KapStone common stock on its books and records if he purchased shares through Broker 1.  After the public announcement of the acquisition, Nahata sold his shares and realized illegal profits of approximately $38,000.  Subsequently, Nahata learned that he was under investigation and fled to India.

4.     Likewise, Bhandari attempted to hide that he traded on the illegal tip he received from Nahata about KapStone's acquisition, lying to his brokerage firm ("Broker 2") about the basis for the trading and the fact that he knew Nahata.

2

After the announcement, Bhandari sold his shares and realized illegal profits of more than $22,000.

5.      By engaging in the conduct described in this Complaint, Defendants violated, and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief the Court may deem just and appropriate.

7.      This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].  Defendants, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facility of national security exchanges, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

8.      Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b), because certain acts, practices, transactions, and courses of business constituting violations of the federal securities laws occurred within the Northern District of Georgia and because Bhandari resides in this district.

## THE DEFENDANTS

9.      **Harsh Nahata**, age 35, was employed as a manager in the corporate development group at WestRock from August 2016 until July 2018, when his employment was terminated.  Between 2011 and 2016, Nahata worked as a stock broker, affiliated with various institutions.  In that capacity, Nahata held Series 7, 63, 86, and 87 securities licenses.  During the time in which the conduct at issue occurred, Nahata resided in Atlanta, Georgia.  After Nahata learned of the SEC's investigation, he fled the country.  He now resides in Mumbai, India.

10.     **Ajay S. Bhandari**, age 46, resides in Cumming, Georgia.  He is employed by a publicly-traded consulting, information technology, and outsourcing company.  He manages that company's relationships with clients in the financial services industry.

## RELEVANT ENTITIES

11.   **KapStone** was a Delaware corporation headquartered in Northbrook, Illinois.  Prior to its acquisition by WestRock, KapStone's stock was listed on the New York Stock Exchange under the ticker symbol "KS."  On January 29, 2018, KapStone announced that it would be acquired by WestRock in a $35 per share, all-cash transaction.  On November 2, 2018, the acquisition closed and KapStone subsequently terminated its securities registration on November 15, 2018.

12.   **WestRock** is a Delaware corporation headquartered in Norcross, Georgia.  The common stock of WestRock trades on the New York Stock Exchange under the ticker symbol "WRK."

## FACTS

### A. Nahata Had Access to—And a Duty Not to Disclose—Material Nonpublic Information Concerning WestRock's Acquisition of KapStone

13.   In June 2017, WestRock began evaluating a potential acquisition of KapStone.  On or about June 20, 2017, the Chief Executive Officer of WestRock ("CEO") instructed the company's Vice President of Corporate Development ("VP") to have his group prepare an independent valuation of the potential transaction.

14.     On or about July 6, 2017, VP assigned Nahata to prepare a written evaluation of KapStone's value.  As a manager in WestRock's corporate development group, Nahata's responsibilities included identifying, analyzing, and valuing companies as potential business combinations for WestRock to consider.

15.     To help ensure confidentiality of this material nonpublic information, VP advised the corporate development team working on the project, including Nahata, to refer to the potential acquisition of KapStone by the code name "Project Kola."

16.     WestRock had corporate policies in place to govern employees' handling of material nonpublic information.  For example, WestRock's Code of Conduct prohibited employees from disclosing such information to others and from buying and selling securities based on such information.

17.     As a WestRock employee, Nahata was subject to WestRock's policies governing material nonpublic information and agreed to be bound by them. Nahata also received training on these policies: completing a training course on WestRock's Insider Trading Policy in August 2016, and completing training on WestRock's Code of Conduct in both January 2017 and February 2018.

18.    Nahata knew that his work regarding the acquisition of KapStone was confidential.  He also knew that he had a duty to WestRock not to trade on the confidential information or to disclose the information to anyone outside of WestRock's deal team.

19.    In July 2017, Nahata prepared a written valuation of KapStone, or "valuation model," which measured the value of KapStone's individual business divisions, and suggested a valuation of $27 per share.  On July 21, 2017, VP sent that valuation model to WestRock's CEO.

**B. WestRock Pursued the KapStone Acquisition and Nahata Traded on Material Nonpublic Information**

20.    On October 2, 2017, CEO asked VP to update the valuation of KapStone.

21.    During the ensuing week, Nahata updated his written valuation of KapStone, increasing its valuation to $34 per share.  At that time, KapStone's common stock was trading between $22 and $23 per share.

22.    On October 27, 2017, the WestRock Board of Directors ("Board") convened for a Board meeting, and Nahata knew that his written analysis of KapStone's value was being presented.  At that meeting, the Board authorized management to engage KapStone about a possible merger.

7

23.     After the Board met, VP and Nahata spoke and agreed that the likelihood of a deal with KapStone had significantly increased.

24.     That same day, October 27, 2017, Nahata accessed his online brokerage account and purchased 100 shares of KapStone common stock at a price of $22.46 per share.

25.     On November 9, 2017, WestRock senior management approached KapStone, and the two companies entered merger discussions.

26.     Between November 9, 2017 and December 7, 2017, Nahata was involved in supporting the negotiations.  He performed numerous tasks related to the potential merger, including:  (1) updating his KapStone valuation analysis; (2) drafting due diligence requests for additional materials from KapStone; (3) participating in internal meetings with WestRock senior management, including the CEO, in which details of the merger were discussed; and (4) working with WestRock's outside financial advisers, who were assisting with the acquisition.  During this period, VP and Nahata discussed that the merger negotiations were progressing and that there was a substantial probability that the deal would close.

**C. Nahata Received a Confidentiality Agreement**

27.     Between December 7, 2017 and January 1, 2018, Nahata travelled to India for a previously planned vacation.  During that period, Nahata had access to his WestRock email account.

28.     On December 13, 2018, WestRock sent Nahata a Confidentiality Agreement relating to the KapStone deal via email.  Nahata was one of approximately 20 recipients of the email.  The Confidentiality Agreement stated that WestRock was engaged in confidential discussions that may result in the acquisition of KapStone and that the recipients of the Confidentiality Agreement were receiving it because they may be or have been asked to participate in the transaction.

29.      In keeping with WestRock's policies on handling material nonpublic information and Code of Conduct, the Confidentiality Agreement reminded recipients that they were "prohibited from disclosing or confirming the fact that discussions regarding a possible transaction are taking place."  It also stated that the "prohibition extends to disclosures to anyone (including your spouse and other family members, friends and WestRock's employees and customers) . . . ."

30.    The Confidentiality Agreement stated further that "[a]ny disclosure made in violation of this letter may violate federal securities laws since WestRock and KapStone are both publicly traded companies.  Accordingly, appropriate disciplinary measures will be taken against any person failing to abide by the terms of this letter."

31.    Finally, the letter reminded recipients that the "proposed transaction should be referred to as 'Project Kola.'"

32.    Nahata received the Confidentiality Agreement in December 2017.

33.    On or about January 1, 2018, Nahata returned from India and continued to be involved in the transaction by assisting a colleague in WestRock's corporate development group with revising and updating the KapStone valuation analysis.

34.    Because Nahata was a member of the deal team and on the list of individuals subject to the Confidentiality Agreement, details regarding the negotiations between WestRock and KapStone were openly discussed in his presence.

35.    As of December 22, 2017, Nahata also had access to a virtual data room which contained confidential financial data relating to KapStone.  In

10

addition, Nahata received daily emails that identified the confidential financial documents shared between KapStone and WestRock.

### D. Nahata Sought to Avoid Detection and Purchased More Shares of KapStone Stock in His Account and in a Second Account Nahata Opened in His Brother's Name

36.     On January 3, 2018, Nahata emailed his brokerage firm, asking:  "If I hold a particular security, would the company know who the holder is? . . . [Do] I show up as a shareholder in [the] company's records or does [the] company's records show [Broker 1] as a shareholder?"

37.     On January 8, 2018, a representative of Broker 1 responded that Nahata's stocks would be held by the firm's clearing partner in "street name" for Nahata's benefit.  The representative provided a link to an online article explaining that "street name" means that the shares are held in the name of the broker or another nominee and allocated by the broker to the client.  In other words, Nahata would not appear as a shareholder in the records of the company whose stock he purchased.

38.     Within days of receiving that response, Nahata began purchasing additional KapStone common stock.

39.     On January 12, 2019, WestRock's Board authorized management to make a $29 per share offer to purchase KapStone.

40.     That same day, Nahata deposited $10,000 cash into his brokerage account and purchased 172 shares of KapStone stock at prices ranging between $25.95 and $26.03 per share.

41.     On January 16, 2018, Nahata deposited an additional $30,000 cash into his brokerage account.  On January 18, he purchased another 200 shares of KapStone stock at prices ranging between $25.35 and $25.40 per share.

42.     Also on January 18, 2018, Nahata opened a new online brokerage account at Broker 1 ("Second Account").  Although Nahata opened the Second Account in the name of his brother, Nahata owned and controlled the Second Account.  The home address and bank account information used to open the Second Account belonged to Nahata.  Similarly, the internet log-ins to this Second Account were all from the same Atlanta-area IP addresses that Nahata used to log-in to his own account.  The internet log-ins to the Second Account were also done on the same dates and around the same times that Nahata logged-in to his own account.  In addition, Nahata's brother was in India at the time the Second Account was opened and the trading in KapStone occurred.

12

43.     On January 19, 2018, Nahata funded the Second Account with a $3,000 deposit from his checking account.

44.     On January 22, 2018, WestRock increased its offer to $35 per share. That same day, Nahata purchased an additional 100 shares of Kapstone stock at $25.69 per share in his account and 37 shares of KapStone stock at $25.65 per share in the Second Account.

45.     On January 25, 2018, Nahata deposited $30,000 from his checking account into the Second Account.

46.     On January 26, 2018, the last trading day before WestRock and KapStone announced the acquisition, Nahata purchased 3,400 shares of KapStone stock at prices ranging between $25.70 and $26.56 per share in his own account, and 220 shares of KapStone stock at prices ranging between $25.77 and $26.58 per share in the Second Account.

47.     In total, from approximately October 2017 to January 2018, Nahata invested over $113,000 in KapStone, a stock in which he had never previously invested.  His KapStone holdings represented approximately 90% of his portfolio in these two accounts.

48.    On January 29, 2018, after the public announcement that WestRock had agreed to acquire KapStone in an all-cash transaction at a cost of $35 per share, Nahata sold all of the KapStone stock he had acquired in both his account and the Second Account, realizing combined illegal profits of approximately $38,002.

**E. Nahata Tipped Bhandari**

49.    In addition to his own illegal trading, Nahata breached his duty to WestRock and its shareholders by tipping his friend, Bhandari, about the acquisition.  Like Nahata, Bhandari traded on the material nonpublic information.

50.    Nahata and Bhandari both come from the Rajasthan region of India and practice the same religion, Jainism, which has approximately 150,000 total followers living in the United States.

51.    In early 2017, when Nahata and his family were moving to Atlanta, a relative of Bhandari, who was also friends with Nahata, introduced the two men. Bhandari and Nahata became friends, socializing with their families multiple times in 2017.  In text messages, Nahata referred to Bhandari, who was ten years Nahata's senior, as "bhaiya," a Hindi word meaning "elder brother."  Bhandari knew Nahata worked at WestRock.

52.    On or about January 14, 2018, while Nahata's family was in India, Bhandari invited Nahata to his house for lunch and to watch a National Football League playoff game.

53.    Approximately two days prior to this lunch, on January 12, 2018, WestRock's Board authorized management to make a $29 per share offer to purchase KapStone, and Nahata purchased 172 shares Kapstone stock.

54.    Sometime during or around the time of this lunch, Nahata tipped Bhandari material nonpublic information about the KapStone acquisition, and Bhandari subsequently traded on the confidential information as described below.

55.    Also during this lunch, Bhandari accessed his brokerage account at Broker 2—the first time he had accessed that account on a weekend in over two months.

56.    On January 16, 2018, the first trading day after Bhandari and Nahata's lunch, Bhandari bought 786 shares of KapStone common stock, a stock he never previously owned, in his brokerage account.  He funded that purchase by both selling stock of a technology company that he had held in the account and transferring money from his savings account.

57.     On January 19, 2018, Bhandari purchased an additional 814 shares of KapStone stock.  Five days later, on January 24, he bought an additional 980 shares of KapStone stock.

58.     Bhandari funded these additional purchases by transferring funds from an online financial advisory account and taking a $25,000 cash advance on one of his credit cards, effectively trading on margin.

59.     On January 23, 2018, Bhandari contacted a representative of Broker 2 and inquired about trading options, which would allow him to buy more KapStone securities, but was told he could not trade options in that account.

60.     On January 29, 2018, the day the merger was publicly announced, Bhandari held approximately $56,000 in KapStone stock, representing 36% of the assets in his brokerage account—by far his largest concentration in any one holding.  That same day, Bhandari sold all his KapStone stock, realizing illegal profits of approximately $22,426.

61.     Nahata received a benefit from disclosing material nonpublic information about WestRock's impending acquisition of KapStone to his close personal friend Bhandari.

16

62.     On February 6, 2018, a representative of Broker 2 contacted Bhandari because his trading in KapStone had triggered an alert.  When questioned about why he invested and if he knew anyone associated with either WestRock or KapStone, Bhandari falsely claimed to have invested in KapStone from his own research and falsely denied knowing anyone associated with WestRock.

**F.  Nahata Flees to India**

63.     Subsequent to the SEC's request for documents relating to Nahata's involvement in WestRock's acquisition of KapStone, WestRock opened an internal investigation of its own.

64.     In July 2018, WestRock's General Counsel and members of its human resources department interviewed Nahata.  During that interview, Nahata admitted to being involved in preparing the Kapstone valuation analysis and knowing that the analysis would be presented to WestRock's Board at the October 27, 2017 meeting.  Nahata also admitted to assisting his colleague with updating the KapStone valuation analysis in January 2018 and knowing that the deal was "hot" at that time.  Nahata also admitted to reading and understanding WestRock's Insider Trading Policy.  However, Nahata refused to answer any questions about his trading in KapStone securities.

65.     Because of his refusal to answer questions about his trading activity, WestRock terminated Nahata for failing to cooperate with its internal investigation.

66.     On July 16, 2018, the Commission staff subpoenaed Nahata, who failed to respond.

67.     After receiving the subpoena from the SEC, Nahata and his family fled the United States and returned to India.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

68.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 67 inclusive, as if they were fully set forth herein,

69.     By engaging in the conduct described above, from approximately October 2017 to January 2018, Nahata and Bhandari directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchanges, in connection with the purchase and sale of securities described herein, knowingly or recklessly:

a.     employed devices, schemes, or artifices to defraud;

18

b.      made untrue statements of material facts and omitted to state material

facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and/or

c.      engaged in acts, practices, and courses of business which operated or

would operate as a fraud or deceit upon any person, in connection with the

purchase or sale of any security,

all as more particularly described above.

70.    Nahata and Bhandari knowingly, intentionally, or recklessly engaged

in the aforementioned devices, schemes or artifices to defraud, made untrue

statements of material facts and omitted to state material facts, and/or engaged in

fraudulent acts, practices and courses of business.  By engaging in such conduct,

Nahata and Bhandari acted with scienter, that is, with an intent to deceive,

manipulate or defraud or with a severely reckless disregard for the truth.

71.    As detailed above, information regarding the acquisition of KapStone

was confidential, material, and nonpublic.  A reasonable investor would have

viewed this information as being important to his or her investment decision and as

significantly altering the total mix of information available to the public.

19

72.     As an employee of WestRock, Nahata owed a duty of trust and confidence to WestRock and its shareholders.

73.     Nahata breached the duty of trust and confidence he owed to WestRock and its shareholders by trading on the basis of this information.

74.     Nahata knew or was reckless in not knowing that it was a violation of the securities laws to trade on the material nonpublic information concerning the acquisition of KapStone.

75.     Pursuant to WestRock's policies on handling material nonpublic information, its Code of Conduct, and Confidentiality Agreement, Nahata also owed a duty to WestRock not to tip material nonpublic information to any other person where such information may be used to his or her profit.

76.     In breach of his duty owed to WestRock and its shareholders, Nahata knowingly or recklessly tipped Bhandari material nonpublic information regarding the acquisition of KapStone.

77.     Nahata and Bhandari knew or were reckless in not knowing that the information concerning the acquisition of KapStone that Nahata provided to Bhandari was material and nonpublic.

78.     Nahata and Bhandari knew or were reckless in not knowing that Nahata had a duty not to tip material nonpublic information regarding the acquisition of KapStone to Bhandari.

79.     Nahata and Bhandari knew or were reckless in not knowing that Nahata breached this duty by tipping Bhandari material nonpublic information regarding the acquisition of Kapstone, while knowing or recklessly not knowing that Bhandari would trade on this information.

80.     Nahata received a personal benefit in exchange for tipping the material nonpublic information regarding the acquisition of Kapstone to Bhandari.

81.     Nahata knew or was reckless in not knowing that it was a violation of the securities laws to tip Bhandari material nonpublic information concerning the acquisition of KapStone.

82.     Bhandari knew, consciously avoided knowing, was reckless in not knowing, or should have known that Nahata disclosed the information in breach of his duty and that Nahata received a personal benefit.

83.     Bhandari intentionally or recklessly traded on the basis of the information that Bhandari knew or was reckless in not knowing was material and nonpublic.

84.    Bhandari knew or was reckless in not knowing that it was a violation of the securities laws to trade on the material nonpublic information concerning the acquisition of KapStone.

85.    By reason of the foregoing, Nahata and Bhandari, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering disgorgement by Defendants of all ill-gotten gains or unjust enrichment, with prejudgment interest, to effect the remedial purposes of the federal securities laws;

**III.**

Ordering Defendants to pay civil penalties up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

**IV.**

Granting such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Respectfully submitted,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Email:  loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
Georgia Bar No. 759054
Email: murnahank@sec.gov

Securities and Exchange
Commission

950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326-1382
Tel: (404) 842-7600
Fax: (404) 842-7666


Jennifer C. Barry
Regional Trial Counsel
(*pro hac vice* motion to be filed)
Email:  BarryJ@sec.gov

John V. Donnelly III
Senior Trial Counsel
(*pro hac vice* motion to be filed)
Email:  DonnellyJ@sec.gov

Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**


Dated: August 12, 2019